IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Branch Banking and Trust Company, )
)                    C.A. No.  6:16-280-HMH
Plaintiff, )
)
vs. )                    **OPINION & ORDER**
)
Market Logistics, Inc., Michael G. Cale, )
and Mildred J. Cale, )
)
Defendants. )

This matter is before the court on Branch Banking and Trust Company's ("BB&T")

motion for default judgment against the Defendants, pursuant to Rule 55 of the Federal Rules of

Civil Procedure.  For the reasons stated below, the court grants BB&T's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 29, 2016, BB&T filed this action against Market Logistics, Inc. ("MLI" or

"Market Logistics"), which was a borrower on a line of credit extended by BB&T, and against

Michael and Mildred Cale, who were guarantors of MLI's obligations owed to BB&T.  (Compl.,

ECF No. 1.)  In the complaint, BB&T seeks:  (1) enforcement against its security for the line of

credit (first cause of action)[1]; (2) recovery on the line of credit against MLI (second cause of

action); (3) recovery against the guarantors for their personal guarantees on the line of credit

---

[1] In the motion for default judgment, BB&T does not seek relief on the complaint's first
cause of action for enforcement of security or the fourth cause of action for violation of
the Racketeer Influenced Corrupt Organization Act.  The court construes BB&T's
statement as a voluntary dismissal, and therefore the first and fourth causes of action are
dismissed.

(third cause of action); (4) recovery against MLI and Michael Cale for violation of the Racketeer Influenced Corrupt Organization ("RICO") Act (fourth cause of action); and (5) recovery against MLI and Michael Cale for willful violation of the South Carolina Unfair Trade Practices Act ("SCUTPA") (fifth cause of action).  The complaint sets forth a sum certain that was due on the line of credit, $4,887,745.87 as of January 27, 2016.  This amount has been updated with collections by BB&T applied to reduce the amount claimed, plus interest, collection expenses, and attorney's fees added to the amount owed.

BB&T served the summons, complaint, and BB&T's answers to Local Rule 26.01 interrogatories on Defendants MLI and Michael Cale on February 4, 2016, and on Defendant Mildred Cale on February 5, 2016.  (Acceptance of Service, ECF No. 6.)  Defendants failed to answer, move, or otherwise defend within the deadline for filing a response after service of process.  On March 4, 2016, the Clerk of Court entered default.  (Entry of Default, ECF No. 8.)  The instant motion for default judgment is now before the court, and is ripe for consideration.

## II. DISCUSSION OF THE LAW

### A. Standard of Review

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides for the entry of default judgment by the court against a party in default.  When a defendant defaults, the court is to accept as true the well-pleaded factual allegations in the complaint as to defendant's liability.  See Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001).  If the court determines that liability is established, it must then determine the appropriate amount of damages.  Unlike allegations of fact, the court does not accept allegations regarding damages as true, but rather makes its own independent determination.  E.g., Credit Lyonnais Secs. (USA),

2

Inc. v. Alcantara, 183 F.3d 151, 154 (2d Cir. 1999).  In this regard, "[a] default judgment must

not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ.

P. 54(c).

 In this matter, the Defendants are in default.  Therefore, BB&T's allegations in the

complaint are deemed admitted and it is entitled to a default judgment against the Defendants

pursuant to Rule 55(b)(2).  Accordingly, the Defendants are liable on each of the well-pleaded

causes of action.

## B. Findings of Fact and Conclusions of Law

### 1. Findings of Fact

 1.  On or about April 6, 2004, BB&T's and MLI's predecessors entered into a Loan and

Security Agreement whereby BB&T agreed to provide a revolving loan of up to three million

dollars ($3,000,000.00) for which BB&T would fund up to the loan amount of, among other

things, 85 percent of MLI's eligible receivables as defined in the Loan and Security Agreement.

(Compl. ¶ 8, ECF No. 1.)

 2.  In conjunction with the Loan and Security Agreement, Defendants Michael and

Mildred Cale each signed a personal and unlimited Guaranty on or about April 6, 2004, for the

debts of MLI, including any future debts incurred by MLI.  (Id. ¶ 10, ECF No. 1.)

 3.  The loan documents were often amended, restated, reaffirmed, or otherwise modified

and updated.  However, in all instances where the loan documents were updated, the line of

credit remained an asset based loan in that BB&T (or its predecessor) would advance to MLI up

to 80 or 85 percent of MLI's eligible receivables, and MLI was obligated to accurately report

those receivables to BB&T in order to secure advances under the line of credit.  (Id. ¶ 11, ECF
No. 1.)

  4.  The most recent amended loan agreement and Note Modification Agreement were
executed on or about September 20, 2013, by which BB&T provided MLI a revolving line of
credit of seven million dollars ($7,000,000.00), to be funded up to the loan amount by bank
advances of up to 85 percent of certain eligible accounts of the Borrower.  (Id. ¶ 12, ECF No. 1.)

  5.  The Guaranty Agreements of Michael and Mildred Cale were last updated on
October 31, 2014, in conjunction with a Loan Modification, Extension, and Forbearance
Agreement.  (Id. ¶ 13, ECF No. 1.)

  6.  Market Logistics was obligated to submit to BB&T certain reports accurately
reflecting their business operations so that BB&T could determine the limit of the credit line
advances and could analyze its collateral for the line of credit.  At the direction of Defendant
Michael Cale, Market Logistics submitted weekly and/or monthly reports to BB&T by United
States Mail, electronic mail, and other means.  These documents were authenticated by the
actual or electronic signatures of Michael Cale and on occasion by the controller or chief
financial officer of Market Logistics.  (Compl. ¶ 14, ECF No. 1.)  Overall, Michael Cale
exercised control over Defendant Market Logistics.  (Id. ¶ 46, ECF No. 1.)

  7.  BB&T based its decisions to continue lending and to increase Market Logistics' credit
line over the course of the borrowing relationship upon the purported accuracy of reports
submitted by Market Logistics on its business operations (the "borrowing base reports").  Based
upon the company's increased assets, primarily accounts receivable, BB&T increased the credit

line incrementally, until it reached the seven million dollars ($7,000,000.00) limit.  (Id. ¶ 15, ECF No. 1.)

8.  By way of examples of the borrowing base reports, on or about July 2, 2015, MLI submitted to BB&T a Loan Base Report that showed an accounts receivable balance of $7,818,950.68 and a loan balance of $5,657,918.88.  On or about August 24, 2015, MLI submitted to BB&T a Loan Base Report for August 13 - 24 that showed an accounts receivable balance of $6,341,770.41 and a loan balance of $6,065,603.56.  (Id. ¶ 16, ECF No. 1; Pl. Mot. Def. J. Ex. 2 (Lioy Aff. ¶ 9), ECF No. 10-2.)

9.  On or about August 31, 2015, BB&T conducted a field exam of Market Logistics' books and records.  Through verification of all outstanding accounts receivable as reported by Market Logistics during the field exam, BB&T was able to determine that Market Logistics, under Michael Cale's direction and control, had falsified the August 24 Loan Base Report by significantly overstating Market Logistics' eligible receivables upon which Market Logistics could borrow from BB&T.  Instead of $6.4 to $7.8 million in eligible receivables recently reported by Market Logistics, Market Logistics had less than $1.0 million in eligible receivables upon which to borrow up to 85 percent on its line of credit from BB&T.  Therefore, instead of BB&T having a loan fully secured by Market Logistics' eligible accounts receivable, BB&T's loan was significantly under-secured by the collateral, which resulted in BB&T's ultimate loss of almost $5 million.  (Compl. ¶ 17, ECF No. 1.)

10.  Market Logistics' borrowing base reports for the several months prior to August 2015 consistently showed eligible receivables to be at approximately the same overstated and inaccurate level in order to induce BB&T to continue advancing money on the line of credit.

Even through the date of the field exam, Market Logistics' general ledger and accounts receivable agings' records continued to inaccurately support the amount reported in the falsified borrowing base reports.  (Id. ¶ 18, ECF No. 1.)

11.  Based upon the false borrowing base reports and other fraudulent information which was submitted by Defendants MLI and Michael Cale, BB&T agreed to continue lending to Market Logistics and increased the amount of money it loaned to Market Logistics.  Market Logistics and Michael Cale intentionally and fraudulently led BB&T to believe that the loans were fully secured by what should have been liquid collateral of MLI's eligible receivables.  (Id. ¶ 41, ECF No. 1.)

12.  Upon discovery of the falsified borrowing base reports, Grant Thornton, LP ("Grant Thornton") was engaged to conduct a forensic analysis of MLI's financial records.  (Pl. Mot. Def. J. Ex. 2 (Lioy Aff. ¶ 2), ECF No. 10-2.)  Based on the analysis of the available data, Grant Thornton identified a "lapping scheme" perpetrated by MLI, and further identified the disbursement by MLI of over $10,000,000 directly to or for the benefit of Michael Cale from 2004 to 2015, including $9,146,292 in a five-year period between 2005 and 2009.  (Id. Ex. 2 (Lioy Aff. ¶ 11), ECF No. 10-2.)

13.  In connection with the lapping scheme and by way of example, Grant Thornton identified fourteen wire payments in May and June, 2015, paid to MLI from MLI's customer Victory Wholesale Grocers ("Victory") where MLI misapplied the payment to older, already paid invoices.  For example, on May 12, 2015, MLI received a wire from Victory in the amount of $35,549.40.  The customer instructed MLI to apply the payment to invoices 147471, 147452, 1474651.  However those invoices were not credited with the payment and were reported as

6

outstanding balances due to MLI (valid collateral) in the July 2, 2015 Loan Base Report.  MLI

applied the payment to older invoices 147248, 147081, 147256, and 146921.  The fourteen

payments misapplied by MLI in just the two-month period of May and June, 2015, totaled

$551,767.45, thereby inaccurately inflating the eligible receivables upon which MLI could

borrow by that amount for just one of MLI's customers.  (Id. Ex. 2 (Lioy Aff. ¶ 13), ECF No.

10-2.)

14.  Defendants MLI and Michael Cale engaged in a pattern of behavior over the course

of Market Logistics' borrowing relationship with BB&T in furtherance of Market Logistics'

fraudulent enterprise to induce BB&T to loan money.  (Compl. ¶ 40, ECF No. 1.)

15.  In addition to falsifying borrowing base reports, Defendants Market Logistics and

Michael Cale damaged BB&T by MLI making and Michael Cale taking excessive distributions.

These distributions were for Michael Cale's personal benefit and for related businesses.  Not

only did Michael Cale take personal distributions within just a five-year period of $9,146,292,

he also paid affiliated businesses substantially more.  In fact, the Grant Thornton review

disclosed payments of $13,025,553 directly to Michael Cale, directly for his benefit such as

personal tax payments, or to companies with which Michael Cale was known to be affiliated.

(Pl. Mot. Def. J. Ex. 1 (Allen Aff. ¶ 18), ECF No. 10-1.)

16.  If Michael Cale had taken reasonable distributions from his company, and not

almost ten million dollars over a five-year span, MLI would have been properly capitalized and

would have been able to pay its loan to BB&T.  Michael Cale took millions of dollars from MLI

for his personal benefit and engaged in a scheme to regularly misrepresent MLI's eligible

7

receivables to BB&T.  As a result of MLI's scheme as it was directed by Michael Cale, BB&T

funded loans of over six million dollars.  (Id. Ex. 1 (Allen Aff. ¶¶ 19-20), ECF No. 10-2.)

17.  BB&T has been damaged by lending money to a borrower whose owner took the

borrower's liquid assets to pay himself and his related businesses, most likely with the very loan

proceeds which BB&T was providing.  BB&T has been damaged by lending on a fully secured

basis when the assets securing the loan were manipulated and falsified by Defendants Market

Logistics and Michael Cale.  Because its loan was not adequately secured, and Market Logistics

does not have the accounts it and Cale pledged that MLI had, BB&T has not been repaid.

### 2. The Well-Pleaded Causes of Action

#### a. Collection of Account

A promissory note is a contract between a lender and borrower, and default in the

repayment arrangements is a breach of contract.  "The elements for a breach of contract are the

existence of the contract, its breach, and the damages caused by such breach."  S. Glass &

Plastics Co. v. Kemper, 732 S.E.2d 205, 209 (S.C. Ct. App. 2012).  "The general rule is that for

a breach of contract the [breaching party] is liable for whatever damages follow as a natural

consequence and a proximate result of such breach."  Id. at 209 (quoting Fuller v. E. Fire & Cas.

Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).

MLI has breached the contract by not paying and is now liable for all amounts borrowed.

MLI is therefore liable for $5,151,374.85.  (Pl. Mot. Def. J. Ex. 1 (Allen Aff.), ECF No. 10-1.;

Id. Ex. 3 (Bunch Aff.), ECF No. 10-3.)  MLI is further liable for attorney's fees as described in

the various loan documents including the note.

b. Guarantor Liability

A guaranty is a contract.  TranSouth Fin. Corp. v. Cochran, 478 S.E.2d 63, 65 (S.C. Ct. App. 1996).  "A guaranty of payment is an absolute or unconditional promise to pay a particular debt if it is not paid by the debtor at maturity."  Citizens & S. Nat'l Bank of S.C. v. Lanford, 443 S.E.2d 549, 550 (S.C. 1994).  "The general rule in South Carolina . . . is that a guaranty of payment is an obligation separate and distinct from the original note."  Id. at 551 (internal citation omitted).

Mildred and Michael Cale unconditionally guaranteed the payment all indebtedness of MLI for valid consideration.  BB&T's complaint establishes this fact and attaches the guarantees as Exhibits C and D.  Mildred and Michael Cale are therefore liable for the entire amount of the $5,151,374.85 debt plus attorney's fees as detailed in the guarantee document.  In addition, their liability is joint and several among themselves and with Defendant Market Logistics, Inc.

c. Violation of SCUTPA

The SCUTPA allows a party who suffers "ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice . . . to recover actual damages."  S.C. Code § 39-5-140(a).  If the court finds that the unfair or deceptive method was "willful or knowing . . . the court shall award three times the actual damages sustained and may provide such other relief as it deems necessary or proper."  Id.  The unfair act complained of must have an adverse impact on the public which includes acts that are capable of repetition.  Daisy Outdoor Advert. Co. v. Abbott, 473 S.E.2d 47, 49-50 (S.C. 1996).

"[I]n private actions under the UTPA, directors and officers are not liable for the corporation's unfair trade practices *unless they personally commit, participate in, direct, or authorize the commission of a violation of the UTPA*." Plowman v. Bagnal, 450 S.E.2d 36, 38 (S.C. 1994) (emphasis added). Further,

> [i]n order to bring an action under the UTPA, the plaintiff must demonstrate (1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest.

Havird Oil Co. v. Marathon Oil Co., 149 F.3d 283, 291 (4th Cir. 1998) (citing Daisy Outdoor, 473 S.E.2d at 49).

MLI and Michael Cale engaged in unfair and deceptive practices in the conduct of trade or commerce and BB&T was harmed because its loan was vastly under-secured. Michael Cale controlled MLI and the creation and submission of its false borrowing base reports to BB&T which he signed before submitting. He created these false reports in order to induce BB&T to continue lending MLI money and to induce it to increase the amount of money MLI could borrow. This pattern of fraud continued for many months, if not years, during MLI's borrowing relationship with BB&T and resulted in BB&T's loans to MLI not being secure because they were based upon false documentation. MLI and Michael Cale willfully and knowingly compromised and undermined banking and commerce which has a direct effect on the public interest. Michael Cale and MLI's actions have the potential for repetition, and the complaint and affidavits show that their unfair and deceptive acts were actually repeated on many occasions. Further, because MLI and Michael Cale knew that the submitted reports were false, they acted willfully and wantonly in violation of the SCUTPA, S.C. Code § 39-5-20, and they

are not only liable for BB&T's actual damages but also for treble damages under S.C. Code

§ 39-5-140(a) and attorney's fees.  Therefore, MLI and Michael Cale are liable for

$5,151,374.85 in actual damages they caused BB&T, and for a trebling of the actual damages

plus attorney's fees.

### C. Attorney's Fees and Expenses of Collection

BB&T also seeks to collect attorney's fees and costs of collection.  Under the second and

third causes of action, the amount of the recoverable fees and collection costs is set by

agreement of the parties at the greater of 15 percent of the amount owed by Defendants, or

actual fees and costs incurred by BB&T.  (Pl. Mot. Def. J. Ex. 3 (Bunch Aff.), ECF No. 10-3.)

Because the actual fees are less than 15 percent, BB&T would be entitled to $772,706.23 for

attorney's fees and costs under the contractual provisions of the applicable documents.  Where a

contractual provision provides for attorney's fees at a specific rate, the amount of attorney's fees

is governed by the contract.  NationsBank v. Scott Farm, 465 S.E.2d 98, 101 (S.C. Ct. App.

1995); Dedes v. Strickland, 414 S.E.2d 134, 137 (S.C. 1992).  Therefore, under the second and

third causes of action, BB&T is entitled to recover $772,706.23 in attorney's fees and collection

expenses.

Under the fifth cause of action, BB&T is entitled to the recovery of its attorney's fees for

violation of the SCUTPA.  See S.C. Code Ann. § 39-5-140.  In the affidavit submitted by

counsel for BB&T, counsel requested a fee award under the fifth cause of action of $134,432.97.

Based on the below legal analysis, the court finds this amount to be reasonable.

The United States Court of Appeals for the Fourth Circuit and Local Civil Rule 54.02,

DSC, mandate a twelve-factor analysis in determining the overall reasonableness of a request for

11

attorney's fees. See Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978); see also Local

Civil Rule 54.02 DSC (setting forth requirement that petitions for attorney's fees comply with

Barber).  The twelve factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered;
> (4) the attorney's opportunity costs in pressing the instant litigation; (5) the
> customary fee for like work; (6) the attorney's expectations at the outset of the
> litigation; (7) the time limitations imposed by the client or circumstances; (8) the
> amount in controversy and the results obtained; (9) the experience, reputation and
> ability of the attorney; (10) the undesirability of the case within the legal
> community in which the suit arose; (11) the nature and length of the professional
> relationship between attorney and client; and (12) attorney's fees awards in
> similar cases.

Id. at 226 n.28.  District courts must make detailed factual findings in support of their

conclusions on attorney's fees.  Id. at 226.

### a. The Time and Labor Expended

The law firm of BB&T's attorney, Robinson McFadden & Moore, PC, has expended

significant time and effort to work on this matter and pursue the case.  As of April 25, 2016,

BB&T's attorney's firm has incurred a total of $35,275.50 in fees, comprised of 134.9 hours in

attorney and paralegal time at billing rates ranging from $105.00 to $290.00 per hour.  (Pl. Mot.

Def. J. Ex. 3 (Bunch Aff.), ECF No. 10-3.)

BB&T's attorney affidavit states that the firm's rates are negotiated with its client, and

the amount is reasonable under the circumstances.  The firm will incur significant additional

time and expense after the entry of judgment in efforts to enforce it.  This additional time will

likely equal at least as much in legal fees as has been already incurred.

Counsel for BB&T has also paid on BB&T's behalf significant collection expenses totaling $28,673.67, the largest part of which was forensic accounting services of $28,064.63. Further, BB&T has paid $5,759.30 to a third party for the field examination commenced in late August 2015. Thus, aside from its legal fees, BB&T has incurred $34,432.97 in collection expenses through April 25, 2016. (Pl. Mot. Def. J. Ex. 3 (Bunch Aff.), ECF No. 10-3.)

b. The Novelty and Difficulty of the Questions Involved

Due to Defendants MLI and Michael Cale actively concealing accurate financial information and intentionally providing incorrect financial information to BB&T, the case was complicated and attorneys were required to conduct significant research. BB&T attorneys and forensic accountants had to piece together records and information to determine that Michael Cale had withdrawn millions of dollars from MLI. The investigation revealed that the case was not a routine collection case against borrower and guarantor but a fraudulent scheme by MLI and Michael Cale to secure inappropriate advances from BB&T. Attorneys for BB&T investigated the case, drafted proper pleadings, managed service of process, secured entry of default, and prepared pleadings for default judgment. Future activities will include preparation of the execution and collection of the judgment, managing the search for assets and advising BB&T of its rights related to collection of the judgment, and the administrative follow up in collecting the judgment.

c. The Skill Required to Properly Perform the Legal Services Rendered

BB&T attorneys' work required significant legal and personal skill such as drafting and filing pleadings, and complying with applicable law including statutes, court rules and common law claims. The nature of this case has required extensive communication with BB&T to keep

their client informed of counsel's progress and the difficulties being encountered with collection

of the debt.  Following entry of a default judgment, it will be necessary for counsel to execute on

the judgment, including investigation of multiple businesses in which the Defendant Michael

Cale is involved and searching for assets.

d. The Attorney's Opportunity Costs in Pressing the Instant Litigation

Because of the complexity of this matter and the financial records, BB&T's attorneys

had to dedicate significant time to it.  This considerable time and effort detracted from other

clients and cases.

e. The Customary Fee for Like Work

Due to client negotiation, the hourly rates charged are below comparable rates in the

legal community.  These hourly rates are reasonable.  A large portion of the fees were incurred

during the significant pre-suit investigation that was necessary to uncover and detail MLI's and

Michael Cale's fraudulent activity.  Considering the attorney experience and skill, the time spent

on this case has been reasonable and customary.  Also, as noted above, legal costs will continue

to increase in the matter.

f. The Attorney's Expectations at the Outset of the Litigation

This factor is primarily determined by whether the fee is fixed or contingent.  The fee in

this case is an hourly rate that is reasonable for the work performed.

g. Time Limitations Imposed by the Client or Circumstances

BB&T expressed a desire to obtain a judgment and to execute on it as quickly and

efficiently as possible considering that its demands for payment from Defendants were ignored.

h. The Amount In Controversy and the Results Obtained

BB&T is likely to obtain a judgment for the full amount to which it is entitled under its

loan documents and the applicable law.  Previously, the Defendants refused BB&T's requests

for payment of the amounts advanced according to the loan documents.

i. The Experience, Reputation and Ability of the Attorneys Involved

BB&T's law firm, Robinson McFadden & Moore, PC, has a long history in the legal

community and extensive experience.  In particular, BB&T's counsel has been actively involved

in commercial litigation including the enforcement of secured claims and collections of

unsecured debts for thirty-two years as a licensed attorney in the State of South Carolina and

holds an "AV" rating by Martindale.

j. The Undesirability of the Case within the Legal Community in which the Suit Arose

The case is not undesirable in the legal community.

k. The Nature and Length of the Professional Relationship between Attorney and Client

This law firm has performed substantial work for BB&T, and it is a long-term client.

l. Attorney's Fee Awards in Similar Cases

A reasonable hourly rate multiplied by the number of hours spent on this case would

yield a substantially similar amount to the attorney's fee BB&T is seeking and fees that have

been awarded in similar cases.

### III. CONCLUSION

Based on the foregoing, the court grants BB&T's motion for default judgment against

Defendants.  The court dismisses BB&T's first and fourth causes of action, but as to the

remaining causes of action on which BB&T expressly seeks relief, BB&T is awarded damages, costs of collection and attorney's fees as follows:

Second Cause of Action:  Actual damages against Market Logistics, Inc. in the amount of $5,151,374.85, plus attorney's fees and costs of collection of $772,706.23.

Third Cause of Action:  Actual damages against Michael and Mildred Cale in the amount of $5,151,374.85, plus attorney's fees and costs of collection of $772,706.23.  The liability of Market Logistics, Inc., Michael Cale, and Mildred Cale under the second and third causes of actions is joint and several.

Fifth cause of action:  Actual damages against Market Logistics, Inc. and Michael Cale, jointly and severally, in the amount of $5,151,374.85, a trebling of the actual damages which is $15,454,124.60, for a total damages award of $15,454,124.60 under this cause of action, plus attorney's fees and collection expenses of $134,432.97.

It is therefore

**ORDERED** that the motion for default judgment, docket number 10, is granted, and the Clerk of Court is hereby instructed to enter default judgment (1) jointly and severally against Defendants Market Logistics, Inc, Michael Cale, and Mildred Cale in the amount of $5,151,374.85, plus $772,706.23 in attorney's fees and collection costs, and (2) jointly and severally against Defendants Market Logistics, Inc. and Michael Cale in the amount of $15,454,124.60, plus attorney's fees and collection expenses of $134,432.97.  BB&T is entitled to only one recovery of actual damages and legal fees against any and all of the Defendants, and one recovery of treble damages against the Defendants Market Logistics, Inc. and Michael Cale, with an offset for these Defendants of any actual damages recovered by BB&T.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
June 2, 2016